# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

### No. ACM 40828

———————————

### UNITED STATES
*Appellee*

**v.**

### Chyron L. TALLEY
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 9 April 2026[1]

———————————

*Military Judge*: Brian M. Thompson.

*Sentence*: Sentence adjudged 26 February 2025 by GCM convened at Nellis Air Force Base, Nevada. Sentence entered by military judge on 17 March 2025: Dishonorable discharge, confinement for 18 months, reduction to E-1, and a reprimand. The convening authority took no action on the findings or sentence.

*For Appellant*: Scott R. Hockenberry, Esquire (argued); Major Samantha M. Castanien, USAF; Captain John M. Fredericks, USAF.

*For Appellee*: Major Catherine D. Mumford, USAF (argued); Colonel Matthew D. Talcott, USAF; Major Vanessa Bairos, USAF; Mary Ellen Payne, Esquire.

Before GRUEN, PERCLE, and MORGAN, *Appellate Military Judges*.

Judge MORGAN delivered the opinion of the court, in which Senior Judge GRUEN and Judge PERCLE joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

[1] The court heard oral argument in this case on 22 January 2026.

———————————

MORGAN, Judge:

A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, UCMJ, 10 U.S.C. § 920, and one specification of domestic violence in violation of Article 128b, UCMJ, 10 U.S.C. § 928b.[2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 18 months, reduction to E-1, and a reprimand. The convening authority took no action on the findings or sentence. The convening authority waived all automatic forfeitures "for a period of six months, or release from confinement, or expiration of term of service, whichever is sooner, with the waiver commencing 14 days after the sentence was adjudged." The total pay and allowances were directed to be paid to LP, the named victim in this case, and Appellant's dependent child.

Appellant raises four issues on appeal, which we have rephrased: (1) whether the Specification of Charge II (sexual assault) is legally and factually insufficient due to the charging scheme, (2) whether the Specification of Charge II is factually insufficient due to weaknesses in the evidence, to include whether the Government failed to disprove mistake of fact as to consent, (3) whether the Specification of Charge I (domestic violence) is factually insufficient, and (4) whether the military judge abused his discretion by excluding evidence under Military Rule of Evidence (Mil. R. Evid.) 412.

We find the military judge abused his discretion by excluding evidence proffered by the Defense under Mil. R. Evid. 412, and finding prejudice for this error, do not reach issues (1) and (2). We find the evidence sufficient to support findings of guilty as to the Specification of Charge I. We take appropriate corrective action in our decretal paragraph below.

## I. BACKGROUND

Appellant's convictions are based on allegations made by Appellant's thenspouse, LP, after Appellant left the marital home. At trial, the Government called two witnesses: LP and an Air Force Office of Special Investigations (OSI) agent who laid the foundation for portions of Appellant's videotaped interview with OSI agents.

———————————

[2] Unless otherwise noted, all references in this opinion to the UCMJ, the Rules for Courts-Martial, and the Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial*, *United States* (2019 ed.).

**A. Domestic Violence Offense**

**1. LP's Testimony**

The domestic violence charge stemmed from an altercation that occurred on 22 September 2023, approximately two weeks before the incident giving rise to the sexual assault allegation. LP testified that during an argument she and Appellant began shoving each other in the hallway of their one-bedroom apartment. LP testified Appellant said something "really awful," and she reacted by picking up a lamp and "hit him with it" in the "shoulder area." She stated as she was then "moving back to try to get away from him" he aggressively approached her and slapped her twice across the face with his hand—once with his palm on one cheek and once with the back of his hand on the other. LP also testified Appellant is six feet, one inch or six feet, two inches in height, and weighs "230, 280 pounds," and she is five feet, three inches in height, and weighs 130 pounds.

The altercation continued into the kitchen, where Appellant made a remark LP described as "really disgusting, really awful," and she reacted by picking up a lunch bag and "like tried to hit him with it." Appellant pulled the object out of LP's grip, tearing her fingernail and causing it to bleed. They sought medical treatment the same day at a local emergency room for the torn nail. No examination or treatment was rendered for the face slaps, which formed the basis of the domestic violence offense; the nail tear incident was not charged.

**2. Appellant's Statement**

Portions of Appellant's OSI interview were admitted at trial. As to the domestic violence charge, Appellant stated in the interview that during the argument which began in their bedroom, he got up to leave. He stated, "I'm 225 pounds, like 6' 2." She's, 5' 4", 130 pounds. Like, if she can't, you know, physically stop me. So I just walk past her, as she was just shoving me in my chest, I just walked into the living room." He stated he was trying to leave the room because he was "done arguing," and LP picked up a lamp whereupon he said to her, "don't hit me with that lamp. Like don't throw that lamp at me." He stated, "And then she proceeded to throw and hit me, hit, hit me with the lamp." Appellant maintained he slapped LP in self-defense, stating, "But like, that was my initial response, because, she continuously put her hands on me, she threw things at me, and then, like, and I'm, I'm just supposed to sit there

and take it? No, it's not okay." Appellant further explained during his interview with OSI:[3]

> I'll be honest, this is the, one and only time I put my hands on her — I slapped her. That's — to me, that's self-defense. She — I provided her multiple times, to stop putting her hands on me. Uh, to, to not throw a lamp at me. Like that's, you know what I mean? Like at, at that point I'm, I'm defending myself because, fine, if it's just your hands, like, I'm more than capable of, of fending you off, just, you know, keeping you off of me. But when you start like throwing objects at me, that could put — like I turned, I was turned around, she could have hit me in the head; knocked me out; gave me brain damage; you know, who knows? Like, so I went over there and I slapped her, I told her [it] wasn't okay.

## B. Sexual Assault Offense

### 1. LP's Trial Testimony

LP testified at trial that on 3 October 2023, Appellant's birthday, Appellant requested they have sex in a specific position with her, "face down, ass up" on the bed. After consensual sexual intercourse began in this position LP, who was pregnant at that time, described withdrawing consent due to discomfort. LP testified Appellant was "pounding" her with his penis and after the fifth "pound," she said, "you need to stop, you're hurting me, you need stop." After telling Appellant he was hurting her three times, Appellant suggested she position herself on a pillow. LP told Appellant, "[N]o, like stop you're being rough," and that he was hurting her and "hurting the baby." LP testified Appellant continued to penetrate LP for about ten minutes, stopping when she began to cry. They then laid down on the bed, and LP apologized to Appellant. When asked on direct-examination why she apologized, she testified:

> He had just always — in our relationship, he has always said, it's not rape because you are my wife. So, I had always felt like, I guess that's, that's what wife's [sic] do, that's my duty is — and that, that that was okay. So, I felt bad, that he didn't get to finish.[4]

---

[3] Portions of this interview were admitted at trial as Prosecution Exhibit 1 and played in open court by trial counsel. The quote is reflected in the transcript.

[4] LP later testified she understood Appellant to mean "[t]hat it was okay for him to sexually force himself towards [her] because [she was] his wife."

She further testified, "So, after that, he, like we laid back down, I was apologetic, and he then, I turned around and he finished."

LP later explained why she apologized: "It's just that it's always been instilled. He instilled that in my brain. That, even when we first started dating, it, it was, it's only rape if you don't like it. And then when we got married it was, it's not rape because you're my wife."

On 30 October 2023, Appellant moved out of the marital home and requested a divorce. LP was upset that he had left and desired reconciliation. A few days after Appellant left, LP reported both the sexual assault and domestic violence to law enforcement. LP confirmed on cross-examination that sometime after reporting Appellant, she sent him a text stating, "Please I won't get you in trouble but I can't do this alone. I don't want our baby to not have a dad." She confirmed she repeatedly texted Appellant, "I'm sorry," and to "Please come home."

### 2. Appellant's Statement to AFOSI

During Appellant's AFOSI interview, Appellant stated that on a handful of occasions during the marriage, LP requested that sex stop after beginning consensually and that in every instance he did as she requested, explaining, "[T]hat's not enjoyable for me at that point." He did not recall the specific sexual encounter on 3 October 2023, but denied he sexually assaulted LP, stating:

> I mean she's vindictive. She's threatened to, like, there's — I have several instances where she's like threatened to kill herself if I didn't do what she wanted; or if I didn't come home when she wanted. Uhm, the way that she talks to me through text message, all of it. You can see, you can go through, you can, you're more than welcome to pull up all my call logs with her.

### 3. OSI Agent Testimony

On cross-examination, an OSI agent testified Appellant consented to a search and evidence extraction of his phone that yielded approximately 10,000 pages of text messages between Appellant and LP. The agent confirmed the text messages included exchanges regarding the 22 September 2023 altercation, as well as admissions by LP to throwing the lamp at Appellant. However, there is no mention of the 3 October 2023 charged sexual assault in the text messages.

## C. Mil. R. Evid. 412 Motions

### 1. Overview

Following Appellant's election to be tried by military judge alone, both the Government and trial defense counsel moved to admit evidence pursuant to

Mil. R. Evid. 412. The Government sought to offer evidence that "[LP] and [Appellant] had an intimate relationship, which included sexual encounters in addition to the misconduct alleged in the specification of Charge II," as "the context for [Appellant] and [LP]'s relationship to one another." As discussed in greater detail below, and the primary issue upon which we decide the case, trial defense counsel sought, *inter alia*, admission of two principal tranches of text messages between Appellant and LP: numerous text messages ranging from approximately one year to the days just before the alleged sexual assault (pre-assault text messages), and one group of text messages exchanged on 4 October 2023, the day after the charged sexual assault (post-assault text messages).

### 2. Defense Mil. R. Evid. 412 Motion

Trial defense counsel's written Mil. R. Evid. 412 motion, dated 31 January 2025, sought to admit, *inter alia*, "during direct or cross examination of [LP], as well as other witnesses if necessary," that "[Appellant] and [LP] were married to each other and engaged in consensual sexual intercourse on numerous occasions prior to the alleged sexual assault;" that "[d]uring the alleged sexual assault, [LP] consented to engaging in sexual intercourse with [Appellant];" that "[a]fter the alleged sexual assault, [LP] and [Appellant] had consensual sexual intercourse on numerous occasions;" and that "[Appellant] and [LP] frequently exchanged text messages about their sex life including arranging for sexual encounters and discussing their sexual encounters afterwards."

#### a. Pre-3 October 2023 Text Messages

Text messages from LP to Appellant, between 27 May 2022 and 26 September 2023, include such statements as, "Okay, bebe, we get up at 6am and have sex and breakfast;" "Be home by 2pm so we can have butt sex;" "I am not ready to go, I'm ready for sex;" and "I'm stressed . . . I didn't sleep at all last night," followed four seconds later with, "I need sex." These text messages are also intermingled with such text messages from LP to Appellant as, "I F[**]KING HATE YOU;" "I HATE YOU;" and "Bro don't worry, I don't plan on taking your time . . . cuz you ain't got a wife."

Trial defense counsel argued these text messages "pertaining to consensual sexual intercourse were needed to show that this was a topic [LP] was comfortable discussing through text, which will be used to highlight the lack of texts pertaining to the alleged sexual assault." Trial defense counsel argued this evidence was admissible under Mil. R. Evid. 412(b)(2) and Mil. R. Evid. 412(b)(3).

In its written response dated 7 February 2025, the Government objected to admission of the text messages. It stated that it "intends to use the same or substantially similar evidence"—that Appellant and LP "were married to each other and engaged in consensual sexual intercourse on numerous occasions

prior to the alleged sexual assault;" that "after the alleged assault [they] had consensual sexual intercourse on numerous occasions;" and the fact that "[d]uring the alleged sexual assault, [LP] consented to engaging in sexual intercourse with [Appellant]" constituted "facts and circumstances of the charged offense and is not evidence of 'other' sexual behavior." However, the Government requested the text messages the Defense sought to introduce at this point in time be excluded, arguing the Defense did not provide timely notice and the text messages were "not relevant, necessary, or material to this case" because they "did not make it more or less probable that [Appellant] sexually assaulted [LP]" on the date charged, and the lack of texts pertaining to the alleged sexual assault "make no impact to [LP's] credibility."

On 22 February 2025, trial defense counsel provided supplemental attachments to its motion containing additional text messages between LP and Appellant from 25 October 2022 through June 2023. Those texts, *inter alia*, included the following messages and exchanges.

On 25 October 2022, the following exchange occurred:[5]

> [LP:] I feel used
>
> [Appellant:] You weren't baby I promise
>
> [LP:] I was used.
>
> [Appellant:] You weren't I would never had sex with you if I knew you'd feel like this
>
> [LP:] you knew but you pressed and now I feel like trash . . . .
>
> [Appellant:] I'm not lying to you baby I told you it was okay if we didn't
>
> [LP:] you kept pushing for it but its besides the point. You take and take and take from me but you can't give
>
> [Appellant:] But I was asking what you needed
>
> [Appellant:] What you wanted
>
> [LP:] I want you to mean what you said last night when you said all you wanted to do is give me flowers, buy me dinner, and show me how much you love me

---

[5] Unless otherwise noted, all referenced text messages are copied verbatim from Appellate Exhibit XVIII. Though some evidence discussed in this opinion is contained in materials sealed by the military judge, we refer to such evidence to the extent necessary to resolve the issues presented in this appeal.

. . . .

[LP:] you forced me to have sex and while having sex you tell me "you miss me" like having sex mean that's all that's love for u.

. . . .

[LP:] I'm not forcing you to do any of these. I'm not forcing you when u sit there and ask me what's wrong.

[Appellant:] I know you're not I'm not saying you are but it feels like it's a threat so you can make sure you're heard

On 21 January 2023, the following exchange occurred when LP locked herself in her bedroom:

[LP:] You made me feel like a piece of p[**]sy

[LP:] I felt gross having sex

[LP:] And I have this inkling that your not telling me something

[Appellant:] Can I come in there and talk to you or do you just want to text?

[LP:] You can come here

On 12 April 2023, the following exchange occurred:

[LP:] I hate you so much. I hate how used I feel

[LP:] U just use me. Ur only ever sweet when you want something from me

[Appellant:] That's not true I gave you love this morning

[Appellant:] I always give you love

[Appellant:] Even last night I was 100% fine with not having sex

[LP:] yet I felt forced

. . . .

[Appellant:] We're going to stop having sex because I hate how you use it against me.

[LP:] IF YOU DON'T WANT TO HAVE SEX THEN FINE I COULD F[**]KING CARE LESS

[LP:] GO BEAT UR F[**]KING D[*]CK FOR THE REST OF YOUR LIFE I COULD F[**]KING CARE LESS ABOUT HAVING SEX WITH YOU!

[LP:] F[**]k you!

8

[Appellant:] You literally said that you felt forced

. . . .

[LP:] Because I didn't want to have sex u you kept loving on me and all that.. so I felt like I had to, I didn't even mention sex at all.

. . . .

[LP] U just use me. Ur only ever sweet when you want something from me

On 26 May 2023, the following exchange occurred:

[LP:] Are you being good? Didn't just use me for sex right?

[Appellant:] I'm being good my love and of course I didn't

. . . .

On 18 June 2023, the following exchange occurred:

[LP:] You could have simply said ok and walked the dog and done

[LP:] But no you have to make me feel like complete f[**]king sh[*]t after using me for sex

[Appellant:] Okay but baby I was trying to explain to you I wanted it to be able to text [person] if he messaged me while I walk the dogs

[Appellant:] I ended up leaving it

[Appellant:] I didn't use you for sex

[LP:] No you ended being really sh[*]tty to me for no f[**]king reason

[LP:] You did! You used me for f[**]king sex! Knowing my f[**]king stomach was I pain

[LP:] You used me like you always f[**]king do!

[LP:] You never change!

[Appellant:] No I didn't I was joking after having it out and you told me to put it in

[LP:] Because you wouldn't f[**]king stop!

[LP:] You had your stupid d[*]ck in my f[**]king face!

[LP:] So thank you for making me feel like complete f[**]king sh[*]t!

9

[Appellant:] I'm sorry I was just playing around and then I thought you wanted to have sex with me

[Appellant:] Because you offered

[LP:] I didn't! I felt forced!

[LP:] You forced me!

. . . .

[Appellant:] I didn't force you baby . . . .

. . . .

[LP:] You got what you wanted and you left me feeling like shit like you always do!

[Appellant:] Baby I wasn't hiding anything and i tried telling you why. I didn't want to have sex with you until you offered.

[LP:] I didn't want sex! My stomach was hurting but you kept forcing your d[*]ck near me!

. . . .

[Appellant:] It seemed like you wanted sex because why else would you offer

[Appellant:] I'm sorry you felt forced

On 22 June 2023, LP sent Appellant the following text:

[LP:] You could be home because you knew I was feeling some type of way. But no. Anything to be with your friends and some b[*]tch! Because you like you use me for sex and treat me like sh[*]t and some other girl you're treating good!

On 29 June 2023, the following exchange occurred:

[LP:] I don't give a f[**]k

[LP:] You want to be a complete ass to me then I'll do the f[**]king same!

[Appellant:] I'm not being an ass you asked questions I already gave you the answers to when I'm trying to rush and leave

[LP:] Of course!!! When you're done using me for sex and needing money from me you turn to a complete ass![6]

Also on 22 February 2025, trial defense counsel provided text messages between LP and Appellant from 24 September 2023, as well as from 4 October 2023 (the latter are discussed in the next section). The former consists, in part, of LP telling Appellant to "Get Out" 12 times and variations of "I hate you" 30 times.[7]

### b. 4 October 2023 Text Messages (Post Sexual Assault)

Trial defense counsel's 22 February 2025 supplement also included text messages between LP and Appellant from 4 October 2023, the day after the charged sexual assault. In those text messages LP expressed she was having difficulties at work, and Appellant suggested she should "just walk out." When Appellant asked LP what she would do for him if he paid her bills, she responded, "You pay my bills . . . I suck you dry," adding separately, "And ass all day everyday."[8]

### 3. Trial Defense Counsel's Mil. R. Evid. 412 Argument

During a closed hearing on the motion, trial defense counsel maintained that evidence related to LP and Appellant's prior consensual sexual relationship would show the charged sexual intercourse was consensual or that Appellant had a reasonable mistake of fact as to consent. With respect to the text messages, trial defense counsel advanced two main theories for admission.[9] The first was that the series of text messages (pre- and post-sexual assault) evidenced LP's desire to consensually engage in sexual intercourse with

---

[6] Appellant was not charged with any offense stemming from these text messages; however, reproduction of these excluded texts is necessary for our resolution of the issue.

[7] The Government's 7 February 2025 written response pre-dates, and hence does not address, the subsequent text messages provided by the Defense on 22 February 2025, reproduced in Section I.C.2.a, *supra*.

[8] We interpret this to indicate either sexual activity generally, or sexual activity focused on a partner's buttocks for an extended period. Our analysis does not turn, however, on any reviewing authority finding this is the exclusive interpretation. It is sufficient to note that all parties viewed this language as sexual in nature and therefore subject to Mil. R. Evid. 412 as do we. It is the fact that LP offered to engage in such activity with her then-husband close in time to the charged sexual assault that we find was required to be considered by the trier of fact.

[9] While trial defense counsel and the military judge generically reference "text messages" without necessarily identifying which tranche to which they were referring (pre- or post-sexual assault), we deem the record sufficiently reflects these two theories of admissibility under Mil. R. Evid. 412 were before the military judge.

Appellant, bearing on whether she consented to the charged sexual assault offense and Appellant's reasonable mistake of fact as to consent. Trial defense counsel also placed special emphasis on LP's 4 October 2023 texts, wherein she appeared to offer Appellant oral sex and other sexual activity, as some evidence tending to show that a sexual assault did not occur the prior day. The second related argument was that the (pre- and post-sexual assault) text messages stood in sharp contrast as LP routinely voiced her anger and resentment towards Appellant when she felt used, forced, or otherwise took issue with a sexual encounter, but texted no such sentiments or allegations following the charged alleged sexual assault.

For example, the following exchange occurred during motion practice:

> [Defense Counsel]: These messages show that [LP] engaged in certain conduct after the sexual encounters, or any time that she had a disagreement with how these encounters would go. She would routinely send text messages to [Appellant] about her displeasure of feeling used for sex, or being forced to have sex.
>
> . . . .
>
> [Military Judge (MJ)]: It seems to me you are . . . arguing that they are relevant vitally so, I think for two reasons then is what I'm hearing. A, to show potential consent or mistake of fact as to consent as to the actual charged offense in the case, is that one?
>
> [Defense Counsel]: Yes, Your Honor. That is the first.
>
> MJ: Okay, and then also to show, essentially by omission, that the fact that there was no conversation subsequent to 3 October 2024, about a nonconsensual sexual act, makes it less likely that that nonconsensual sexual act occurred?
>
> [Defense Counsel]: Yes, Your Honor. Not only that, but that coupled with the message she — messages she did send on 4 October [2023], offering to engage — to quit her job, and engage in consensual sex.

Referring specifically to the 4 October 2023 texts, trial defense counsel further argued:

> [Defense Counsel]: So those are inconsistent with one, her behavior during previous episodes where she did not agree with having sex, or having been used for sex. And the fact that this happened the day after she was allegedly sex assault – allegedly assaulted, the [D]efense believes it is necessary to draw

these differences out, to help show that the incidents on October 3rd was actually consensual.

. . . .

[Defense Counsel]: Your Honor, these messages indicate a willingness to engage in future consensual sexual activities

. . . .

When the military judge asked why these text messages were not cumulative to the unobjected-to evidence that LP and Appellant had been involved in an ongoing sexual relationship, the following exchange occurred:

[Defense Counsel]: Your Honor, considering that we have not had the opportunity to speak to [LP] —

MJ: Well, you got hundreds of pages of text messages that would pretty much tell you what she is going to say.

[Defense Counsel]: Yes, Your Honor, that is correct. Which is why I want to draw out those text messages. We have no idea how she is actually going to testify during the court; we have no idea what she's going to say; and these text messages could be impeachment upon any statement that she makes.

MJ: Sure.

[Defense Counsel]: So, we are noticing these exact text messages so that the [G]overnment and victims['] counsel are not caught off guard by the presentation of this evidence should it become relevant or necessary during [LP's] testimony.

MJ: So, essentially you asked the question, hey, isn't it true you never said anything about a nonconsensual sexual encounter the night before in any email, and she answers, oh yes I did, and then you would impeach her with these text messages?

[Defense Counsel]: Yes, Your Honor, that would be one potential use of them.

MJ: Which would be impeachment, not for substantive purposes though.

[Defense Counsel]: Yes, Your Honor, that is accurate.

MJ: Okay, I'm just making sure —

[Defense Counsel]: Yes, Your Honor.

MJ:  — I'm really not trying to trick you; I'm just trying to make sure I understand where we are going with this.

[Defense Counsel]:  That is correct, Your Honor.

MJ:  Okay, and then as to the first one, the fact that the first use that she was willing to engage in consensual sexual activity, everything I read in this is this alleged — or, the charged offense began consensually, and so the fact that she was willing to engage in consensual sex the night of 3 October [2023] is already allowed by the other items that you've noticed, correct?

[Defense Counsel]:  Yes, Your Honor.

MJ:  So, I don't understand what — how all these text messages add to the issue of whether that event on 3 October began consensually.

[Defense Counsel]:  Your Honor, it mostly goes towards the fact as to her behavior afterwards, based upon prior incidents.  That is our primary purpose for using these, to show that she did not act in accordance with how she has in the past.

MJ:  Okay, got it.  Anything else?

[Defense Counsel]:  No, Your Honor.

The Government presented no argument on the motion, stating they would "just rest on [their] written filings."

### 4. Military Judge's Ruling

The military judge granted the defense motion in part, permitting trial defense counsel to ask LP "whether the [sic] she and [Appellant] 'engaged in on-going consensual sexual intercourse as a normal part of their relationship' before and after the alleged sexual assault." He also ruled the Defense could ask LP whether she referenced any sexual assault in her text messages.

Beyond that, the military judge denied admission of the "sexually tinged text messages" as failing "both the relevancy and prejudice analysis under [Mil. R. Evid.] 412 and [Mil. R. Evid.] 403." The military judge rejected trial defense counsel's argument that the pre-sexual assault texts were relevant to show that LP wanted to engage in sexual intercourse with Appellant reasoning they did not "refer to the charged sexual-assault event of 3 October 2023, which testimony will already demonstrate began consensually." The military judge also rejected the argument that since LP was "comfortable" discussing sexual topics in text messages, her failure to mention the charged sexual assault in any text messages made it more likely there was

14

no sexual assault. He ruled the "[D]efense has failed to make the logical connection to support the proposition that 'comfort' discussing consensual sexual activity in text messages vice non-consensual ones are equivalent."

The military judge further ruled that any "low probative value as to the sexually tinged text messages" was "substantially (and markedly) outweighed by the high prejudicial impact under [Mil. R. Evid.] 403." He reasoned, "evidence of specific texted desires to engage in sexual activity (unrelated to the charged offense) is a waste of time, needlessly presents cumulative evidence, and has the potential to divert the trier of fact[']s attention from the facts related directly to the offense that allegedly occurred on or about 3 October 2023."

The military judge did not address the mistake of fact defense as to consent in his ruling, nor did he specifically articulate his analysis of Fifth or Sixth Amendment[10] criteria to Appellant's case.

**D. Cross-Examination of LP**

During cross-examination of LP during findings, trial defense counsel sought to demonstrate that she had a motive to fabricate her allegations because she was upset at Appellant for leaving her and wanted to reconcile. She confirmed she sent Appellant texts stating, "Please I won't get you in trouble but I can't do this alone," and "Please come home." The Defense also obtained her confirmation that she laid down with and apologized to Appellant immediately following the charged sexual assault. Trial defense counsel also elicited an affirmative response from LP that she communicates a lot by text because it is easier for her to get out what she wants to say.

Consistent with the military judge's Mil R. Evid. 412 ruling, trial defense counsel asked and received affirmative responses from LP that she engaged in consensual sexual intercourse with Appellant before and after 3 October 2023. As to text messages as they related to the sexual assault allegation, trial defense counsel engaged in the following exchange with LP:

> [Defense Counsel]: Now, in your text messages with [Appellant], isn't it true that you never once confronted him about the sexual assault, is that correct?"
>
> [LP]: I, I don't remember if I did or did not, sir.
>
> [Defense Counsel]: Is it possible that you never once confronted him about the sexual assault on text message?
>
> [LP]: I, I don't know.

---

[10] U.S. CONST. amend. V, VI.

[Defense Counsel]: You don't know if it's possible?

[LP]: It could be possible, but I don't know.

Trial defense counsel also inquired into statements LP had attributed to Appellant during her direct examination:

[Defense Counsel]: Okay. Now, you testified that on multiple occasions [Appellant] said, it's not rape if you're my wife, is that correct?

[LP]: Yes, sir.

[Defense Counsel]: Now, if I had your entire text messages with him, where would I find that?

[LP]: I don't know if [he] said it in the text message, or he said it out, when we are talking in person.

[Defense Counsel]: Do you have any memory of him saying that in the text messages?

[LP]: I wouldn't. I wouldn't know, sir. It's a lot of text messages. I wouldn't remember.

The following questions and answers were asked and answered regarding LP and Appellant's consensual sexual relationship:

[Defense Counsel]: Okay. Now, I want to be precise with how I ask this. Before the sexual assault you had sexual encounters with [Appellant], correct?

[LP]: Yes.

[Defense Counsel]: Okay. And after the sexual assault, you had sexual encounters with [Appellant], correct?

[LP]: Yes.

**E. Re-Direct Examination of LP**

On re-direct examination, trial counsel sought further explanation from LP as to why she apologized to Appellant immediately following the charged sexual assault:

[Trial Counsel]: Okay. And so, you apologized to [Appellant] after the sexual assault. Why did you do that?

[LP]: I apologized because I. It's just that it's always been instilled. He instilled that in my brain. That, even when we first started dating, it, it was, it's only rape if you don't like it. And then when we got married it was, it's not rape because you're my wife.

**F. Defense Argument on Findings**

During closing argument, consistent with the military judge's Mil. R. Evid. 412 ruling, trial defense counsel confined his discussion of the 4 October 2023 text messages to the following:

> [LP], testified to the court, that she doesn't remember if she sent a text pertaining to this incident or not, but it's possible that she didn't. Now, why does this matter? The [G]overnment wants you to believe that a lack of these text messages is a red herring, but Your Honor it's not. We know, that this is how [LP] interacts with [Appellant]. . . . You know that when she has an issue with something such as the alleged domestic violence, she engages through text. And that simply did not happen here.

The military judge convicted Appellant of all charges and specifications.

## II. DISCUSSION

**A. Sexual Assault**

**1. Law**

**a. Generally**

As charged, the elements for sexual assault are that (1) Appellant committed a sexual act upon LP by penetrating LP's vulva with Appellant's penis; and (2) that Appellant did so without LP's consent. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d). "Sexual act" is defined, as relevant here, as "the penetration, however slight, of the penis into the vulva or anus or mouth." *MCM*, pt. IV, ¶ 60.a.(g)(1)(A). "Consent" is defined as "a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "Submission resulting from the use of force, threat of force, or placing another person in fear also does not constitute consent." *Id.* "A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent." *Id.* "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C).

**b. Withdrawn Consent**

In *United States v. Hunt*, a panel of this court recently held that

> in a withdrawn-consent case, an accused is guilty of sexual assault without consent when the Government proves beyond a

reasonable doubt that an accused continues the charged sexual act after the revocation of consent by the victim. We find that the defense of mistake of fact as to consent, if reasonably raised by the evidence, also applies in withdrawn-consent cases and that the Government continues to bear the burden to prove that, in such circumstances where consent was given and then withdrawn, the accused did not have an honest and reasonable mistake of fact as to consent for the continued sexual act.

No. ACM 40563, 2025 CCA LEXIS 215, at *21–22 (A.F. Ct. Crim. App. 16 May 2025) (unpub. op.), *cert. filed*, __ M.J. __, 2025 CAAF LEXIS 734 (C.A.A.F. 2025).

"[C]onsent to a sexual act can be withdrawn at any time, even after the sexual act has begun." *Id.* at *21. We also hold, if reasonably raised by the evidence, the mistake of fact defense applies in such cases.

### c. Reasonable Mistake of Fact as to Consent

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." Rule for Courts-Martial (R.C.M.) 916(j)(1). If the mistake goes to an element requiring general intent or knowledge, it "must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id.* Therefore, an honest and reasonable mistake that the victim consented to the charged sexual act is an affirmative defense to the charged offense. *See*, *e.g.*, *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019) (considering the defense of mistake of fact to a charge of sexual assault). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see McDonald*, 78 M.J. at 379.

In considering whether the defense of mistake of fact as to consent was raised at trial, we "consider the totality of the circumstances at the time of the offense" and consider "whether the record contains some evidence of an honest and reasonable mistake to which the [fact finder] could have attached credit if they had so desired." *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003) (citations omitted). While the quantity of evidence required is low, the record must contain evidence supporting both the subjective "honest" and the objective "reasonable" mistaken belief. *See United States v. Davis*, 76 M.J. 224, 230 (C.A.A.F. 2017) (citation omitted) ("[W]hile [the a]ppellant's statement may constitute a scintilla of evidence about his 'honest belief,' . . . there is not an iota of evidence that such a belief was reasonable."); *see also United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995) (citations omitted) ("The testimony relied on by [the] appellant tended to show objective circumstances upon which

a reasonable person might rely to infer consent. However, they provided no insight as to whether appellant actually or subjectively did infer consent based on these circumstances.").

In *United States v. Greaves*, our superior court's predecessor stated,

> It would seem that one is not being reasonable if one is being reckless or negligent. Thus it would seem that for one reasonably to believe something, one must have taken such measures as to not be reckless or negligent with respect to the truth of the matter. In other words, one must be seen as exercising due care with respect to the truth of the matter in issue.

40 M.J. 432, 437 n.5 (C.M.A. 1994). "If a mistake is honest yet 'patently unreasonable,' the defense is unavailable to an appellant." *United States v. Rodela*, 82 M.J. 521, 526 (A.F. Ct. Crim. App. 2021) (quoting *Davis*, 76 M.J. at 230).

### d. Mil. R. Evid 412 Generally: The Victim's Sexual Behavior or Predisposition

The *Manual for Courts-Martial* recognizes certain privileges that may limit the availability of evidence at a court-martial. In particular, Mil. R. Evid. 412 provides that evidence of an alleged victim's sexual predisposition and evidence that an alleged victim engaged in other sexual behavior is generally inadmissible. Mil. R. Evid. 412(a). "'Sexual behavior' includes any sexual behavior not encompassed by the alleged offense," while "'sexual predisposition' refers to a victim's mode of dress, speech, or lifestyle . . . that may have a sexual connotation for the fact finder." Mil. R. Evid. 412(d). The intent of the Rule is to "shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to sexual offense prosecutions." *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (alteration and citation omitted).

One exception to the Rule is Mil. R. Evid. 412(b)(2), which makes admissible "evidence of specific instances of a victim's sexual behavior with respect to the person accused of the misconduct, if offered by the accused to prove consent."

Another exception to the Rule is when exclusion of the evidence would violate an accused's constitutional rights. Mil. R. Evid. 412(b)(3). To show that the exclusion of evidence would violate an accused's constitutional rights, the accused must show that the evidence "is relevant, material, and favorable to his defense," "and thus whether it is necessary." *United States v. Banker*, 60 M.J. 216, 222 (C.A.A.F. 2004) (citations omitted). The term "favorable" means the evidence is "vital." *United States v. Smith*, 68 M.J. 445, 448 (C.A.A.F. 2010) (citations omitted). It is the accused's burden to demonstrate an exception applies. *Banker*, 60 M.J. at 223 (citations omitted).

19

Evidence falling under the Mil. R. Evid. 412(b)(3) exception is not weighed against a victim's privacy and is instead only analyzed under Mil. R. Evid. 403; that is, a military judge determines whether the probative value of such evidence outweighs the danger of unfair prejudice. Mil. R. Evid. 412(c)(3). Evidence challenging the credibility of key government witnesses may fall under this exception. *See, e.g., United States v. Williams*, 37 M.J. 352, 360–61 (C.M.A. 1993). "If after the application of [Mil. R. Evid.] 403 factors the military judge determines the probative value of the proffered evidence outweighs the danger of unfair prejudice, it is admissible no matter how embarrassing it might be to the alleged victim." *United States v. Gaddis*, 70 .M. 248, 256 (C.A.A.F. 2011).

"In applying [Mil. R. Evid.] 412, the judge is not asked to determine if the proffered evidence is true . . . . Rather, the judge serves as gatekeeper deciding first whether the evidence is relevant and then whether it is otherwise competent, which is to say, admissible under [Mil. R. Evid.] 412." *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010) (omission in original) (quoting *Banker*, 60 M.J. at 224). In *United States v. Leonhardt,* this court concluded, "Because the proffered evidence was relevant, material, and its probative value outweighed the danger of unfair prejudice, it met the exception for constitutionally-required evidence and was admissible under Mil. R. Evid. 412(b)(1)(C)." 76 M.J. 821, 828 (A.F. Ct. Crim. App. 2017) (citation omitted).

### e. Mil. R. Evid. 412(b)(3): The Constitutionally Required Exception

#### (i) Generally

"We review the military judge's ruling on whether to exclude evidence pursuant to [Mil. R. Evid.] 412 for an abuse of discretion." *Ellerbrock*, 70 M.J. at 317 (citing *Roberts*, 69 M.J. at 26). The military judge's findings of fact are reviewed for clear error, and his conclusions of law are reviewed de novo. *Id.* (citing *Roberts*, 69 M.J. at 26). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). "For [a] ruling to be an abuse of discretion, it must be 'more than a mere difference of opinion'; rather, it must be 'arbitrary, fanciful, clearly unreasonable' or 'clearly erroneous.'" *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (additional citations omitted)). However, when an error at trial is of constitutional dimensions, we assess de novo whether the error was harmless beyond a reasonable doubt. *United States v. Prasad*, 80 M.J. 23, 29 (C.A.A.F. 2020).

Evidence is generally constitutionally required and "must be admitted within the ambit of [Mil. R. Evid.] 412(b)(1)(C) when [it] is relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice." *Ellerbrock,* 70 M.J. at 318 (citation omitted). Relevant evidence is evidence that has any tendency to make the existence of any fact of consequence to determining the case more probable or less probable than it would be without the evidence. Mil. R. Evid. 401. Relevance is a "low threshold." *Roberts*, 69 M.J. at 27. Materiality "is a multi-factored test looking at 'the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue.'" *Ellerbrock*, 70 M.J. at 318 (alteration in original) (citations omitted). The dangers of unfair prejudice to be considered "include concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* at 319 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). The Mil. R. Evid. 403 balancing test "is a rule of inclusion." *Banker*, 60 M.J. at 223. Military judges receive wide discretion in conducting balancing under Mil. R. Evid. 403, but military judges' rulings receive less deference if they fail to articulate their analysis on the record. *Collier*, 67 M.J. at 353.

In *United States v. Sousa*, this court deemed the fact that the complainant engaged in consensual sexual activity with the appellant after the date she alleged she was forcibly sodomized was constitutionally required to be admitted on the issue of consent or mistake of fact as to consent. 72 M.J. 643, 649 (A.F. Ct. Crim. App. 2013). That court also observed that "[t]rials are fluid . . . and evidence that may not be constitutionally required at the outset of the trial because it fails the balancing test may become constitutionally required as other evidence is introduced." *Id.* at 650. Similarly, in *Leonhardt*, 76 M.J. at 827 (citations omitted), this court held that, "[i]n general, willingness to engage in consensual sexual activity has *some* tendency to indicate that recent prior sexual encounters between two individuals were also consensual."

### (ii) Sixth Amendment

An accused's confrontation right is one of many that "guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted). Accordingly, "[a] defendant's Sixth Amendment right to confront the witnesses against him is violated where it is found that a trial judge has limited cross-examination in a manner that precludes an entire line of relevant inquiry." *United States v.*

*Israel*, 60 M.J. 485, 488 (C.A.A.F. 2005).[11] This is so because an accused's opportunity to enter evidence—even through cross-examination "would be an empty one if the State were permitted to exclude competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence." *Crane,* 476 U.S. at 690. A military judge's "exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the [Government's] case encounter and 'survive the crucible of meaningful adversarial testing.'" *Id.* at 690–91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

Ultimately, the test for whether a trial judge's limits were appropriate is whether a reasonable panel might have received "a significantly different impression" of a witness's credibility had appellant been able to conduct cross-examination using the excluded evidence. *Van Arsdall*, 475 U.S. at 680; *Gaddis*, 70 M.J. at 256.

### (iii) Due Process

Additionally, the right to cross-examine a witness for impeachment purposes has constitutional underpinnings because of the right to confront witnesses under the Sixth Amendment and the due process right to present a complete defense. *United States v. Beauge*, 82 M.J. 157 (C.A.A.F. 2022). Our superior court held in *United States v. Teffeau*, 58 MJ 62 (C.A.A.F. 2003), that fundamental due process demands that an accused be afforded the opportunity to defend against a charge before a conviction on the basis of that charge can be sustained; few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused. *See also United States v. Hennis*, 79 M.J. 370 (C.A.A.F. 2020) (holding the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense).

### 2. Analysis

We find the military judge abused his discretion when he excluded all of the proffered text messages under Mil. R. Evid. 412 and Mil. R. Evid. 403 as irrelevant and unfairly prejudicial.

---

[11] *See also Ellerbrock*, 70 M.J. at 318 ("The exception for constitutionally required evidence in [Mil. R. Evid.] 412(b)(1)(C) includes the accused's Sixth Amendment right to confrontation. An accused has a constitutional right to be confronted by the witnesses against him . . . [and] that right necessarily includes the right to cross-examine those witnesses against him. . . . In particular, the right to cross-examination has traditionally included the right to impeach, *i.e.*, discredit the witness." (internal quotation marks and citations omitted)).

### a. Pre-3 October 2023 Text Messages

Relevancy is a "low threshold." *Roberts*, 69 M.J. at 27. Whether LP consented to the entire sexual encounter with Appellant on 3 October 2023 was, of course, of fundamental significance in determining Appellant's guilt. The first group of pre-3 October 2023 text messages include several messages wherein LP initiated, requested, and arranged sexual encounters with Appellant, articulating the terms of when and what type of sex she desired, *e.g.*, "[W]e get up at 6am and have sex and breakfast;" "Be home by 2pm so we can have butt sex;" "I am not ready to go, I'm ready for sex;" and "I'm stressed . . . I didn't sleep at all last night," followed four seconds later with, "I need sex."

These text messages meet the low threshold of relevance as to whether LP consented to sex with Appellant throughout the charged sexual encounter. We believe it an erroneous interpretation of relevance to exclude them because they did not refer specifically to 3 October 2023. Admissibility of evidence under Mil. R. Evid. 412 is not limited to that which is *res gestae*. In fact, "sexual behavior" includes, by definition, any sexual behavior not encompassed by the alleged offense. Mil. R. Evid. 412(d). That the sex on 3 October 2023, according to LP, began consensually does not foreclose Appellant from presenting a defense that either the entire episode was consensual or that he reasonably believed LP consented throughout.

Additionally, the military judge did not rule on the Defense's argument that the entire series of texts messages (both pre- and post-sex assault) were relevant not only to whether LP consented throughout the charged sexual episode, but were also relevant as to whether Appellant had an honest and reasonable mistake of fact as to consent. The record reflects the following facts, *inter alia*, which sufficiently raised a mistake of fact defense: (1) LP and Appellant were in a marital relationship and engaged in sexual intercourse on multiple occasions before and after the charged offense, (2) according to LP, sex on 3 October 2023 began consensually, (3) LP apologized to Appellant when the intercourse stopped, and they engaged in sexual intercourse shortly thereafter, and (4) LP's testimony that it was "instilled in her brain" that it was her "duty" to have sex with her husband Appellant.

"Military judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997). Nonetheless, in the absence of discussion or analysis by the military judge of Appellant's advanced mistake of fact defense, and cursory analysis of his constitutional claims, we give little deference to his ruling. As noted in *Hunt*, unpub. op. at *21–22, the mistake of fact defense had been held applicable to withdrawn consent prosecutions. Additionally, the Defense's Mil. R. Evid. 412 written motion cited *Leonhardt*, 76 M.J. at 827, which held that

generally, "willingness to engage in consensual sexual activity has *some* tendency to indicate that recent prior sexual encounters between two individuals were also consensual." Cited within *Leonhardt* is a published opinion by this court that held "[e]vidence that [the victim] engaged in consensual sexual activity with the appellant after the date she alleged she was forcibly sodomized was constitutionally required to be admitted on the issue of consent or mistake of fact as to consent." *Sousa*, 72 M.J. at 649.

### b. Pre and Post 3 October 2023 Text Messages

The military judge also rejected the Defense's argument that it should be permitted to cross-examine LP on the text messages she sent Appellant before the charged sex assault wherein she explicitly expressed feeling victimized as "forced" into or "used" for sex by Appellant, but made no such allegations following the charged sexual assault. He ruled the "[D]efense has failed to make the logical connection to support the proposition that 'comfort' discussing consensual sexual activity in text messages vice nonconsensual ones are equivalent." We concur with the logical relevance argument advanced by trial defense counsel—LP's *silence* via text messages on the matter of feeling forced, used, or sexually assaulted *following* 3 October 2023 was inconsistent and stood in stark contrast with her texted expressions of being "used" or "forced" stated in text messages *prior* to 3 October 2023. LP testified she felt she could best express herself through text messages; these text messages demonstrated a history of forcefully expressing her emotions about feeling "used" or "forced" by Appellant following sexual encounters. Though the circumstances of the 3 October 2023 charged offense may not be "equivalent," this series of pointed text messages shortly following sexual encounters for which LP felt abused has some tendency to make it less likely she believed she was sexually assaulted on 3 October 2023, to which she expressed no objection.

Second, we find exclusion of the use of the pre-3 October 2023 text messages was an unreasonable limitation on Appellant's Sixth Amendment right to confront LP's testimony that she was a meek and dutiful wife compelled to apologize and offer additional sexual intercourse to Appellant when she had not gratified him sexually. LP testified during findings that she had a "duty" to see that Appellant "finished" because "that's what wife's [sic] do," and that was "[her] duty . . . and that, that that was okay. So, [she] felt bad, that he didn't get to finish." During findings argument, the Government argued:

> And, turning to the sexual assault allegation, when we listen to the OSI interview and [Appellant] seems confused, as to this allegation that his wife is making about sexual assault, and he doesn't remember sexually assaulting her, and he is confused. But [LP] told you exactly why he is confused. And that's because

he doesn't believe that either rape or sexual assault, kind of synonymous in this function that it's been used, cannot occur against his wife. That's why he is confused. Because the definition that he has been using, that he can legally assault his wife, whenever he wants, it doesn't match up with what is happening in that OSI interview room. He doesn't think it's sexual assault, because she's his wife. And he doesn't even remember it happening anyway.

The initial tranche of text messages dated between 27 May 2022 and 26 September 2023 and reproduced in Section I.C.2.a, had some tendency to show LP had agency and was capable of expressing when and on what terms they would have sex, *e.g.*, "Okay, bebe, we get up at 6am and have sex and breakfast;" "Be home by 2pm so we can have butt sex;" "I am not ready to go, I'm ready for sex;" and "I'm stressed . . . I didn't sleep at all last night," followed four seconds later with, "I need sex." The text messages from 25 October 2022 through June 2023, excerpts of which are reproduced in Section I.C.2.a, also showed that on numerous occasions LP expressed very different and unambiguous views towards Appellant other than a duty-bound spouse with no say on matters of sex. Text messages—such as "GO BEAT UR . . . I COULD F[**]KING CARE LESS ABOUT HAVING SEX WITH YOU!," etc.— depict a very different, volatile, and combative relationship than the one painted in her testimony.

Appellant's OSI interview, introduced into evidence by the Government, included Appellant's following statement, "I mean she's vindictive." Appellant added, "Uhm, the way that she talks to me through text message, all of it. You can see, you can go through, you can, you're more than welcome to pull up all my call logs with her." However, the military judge's exclusion of the text messages chilled the Defense's ability to present those actual text messages to the fact finder—evidence that would have challenged and contradicted LP's testimony regarding her docile behavior.

The Government leveraged LP's testimony in this regard to argue its theory that Appellant's confusion by the sexual assault allegation when interviewed by OSI stemmed from his view that he could not sexually assault his wife. We also find exclusion of the pre-3 October 2023 text messages deprived Appellant of his due process opportunity to meaningfully challenge the Government's theory of criminal liability.

As this court observed in *Sousa*, 72 M.J. at 650, "[t]rials are fluid . . . and evidence that may not be constitutionally required at the outset of the trial because it fails the balancing test may become constitutionally required as other evidence is introduced." Ideally, the Defense would have renewed their motion to admit these text messages following LP's testimony about her "duty"

to sexually gratify Appellant,[12] however, during the Mil. R. Evid. 412 hearing the Defense did anticipate potential uses of these text messages during LP's cross-examination. Trial defense counsel argued they had not been afforded an opportunity to interview LP in advance of trial and averred, "[W]e are noticing these exact text messages so that the [G]overnment and victims['] counsel are not caught off guard by the presentation of this evidence should it become relevant or necessary during [LP's] testimony." Beyond their use for potential impeachment were LP to deny on cross-examination ever having sent such texts, the military judge stated, "I don't understand what — how all these text messages add to the issue of whether that event on 3 October [2023] began consensually." He then ruled they were otherwise inadmissible.

We find the military judge's preclusion of an entire line of relevant inquiry prevented the Defense from demonstrating "a significantly different impression" of LP's credibility had trial defense counsel been able to conduct cross-examination using the excluded evidence.

### c. Post 3 October 2023 Texts

The day after the charged sexual assault, LP sent Appellant, as reproduced in Section I.C.2.a, text messages telling him, "You pay my bills . . . ." We addressed trial defense counsel's argument that these texts evidenced LP's lack of an expressed belief she was sexually assaulted when juxtaposed with earlier text messages confronting Appellant when she did take issue with his sexual behavior. Here, we address trial defense counsel's argument that these texts were also independently relevant as evidence that a sexual assault did not occur the prior day.

We recognize the military judge permitted the Defense to cross-examine LP on the generic fact that she did not confront Appellant through text messaging about the sexual assault, and the following exchange occurred during cross-examination:

> [Defense Counsel]: Now, in your text messages with [Appellant], isn't it true that you never once confronted him about the sexual assault, is that correct?
>
> [LP]: I, I don't remember if I did or did not, sir.
>
> [Defense Counsel]: Is it possible that you never once confronted him about the sexual assault on text message?
>
> [LP]: I, I don't know.

---

[12] Alternatively, the military judge could have reconsidered his ruling *sua sponte* when the relevance of the text messages ripened following LP's testimony.

[Defense Counsel]: You don't know if it's possible?

[LP]: It could be possible, but I don't know.

We believe the military judge unreasonably limited trial defense counsel's ability to confront LP with the substance of her text messages to Appellant on 4 October 2023. Within 24 hours of what she described as a painful and emotional sexual assault, LP initiated lighthearted sexual banter that included offers to engage in various consensual sexual acts with and for Appellant. We find these offers express, at a minimum, a "willingness" to engage in sex with Appellant, particularly when LP testified she did in fact engage in consensual sex with Appellant immediately after the charged sexual assault offense. This is not to say there were not some potential limits the military judge could have set with respect to the scope of their use or descriptions therein, but to exclude them, or reference to them, in their entirety was error.

Additionally, we conclude there is a qualitative evidentiary difference between cross-examination of a witness on the fact that something did not happen (an absence of texts from LP to Appellant confronting him about a sexual assault), and that something did happen – in this case that LP, the day after the charged offense, offered to perform oral sex and engage expressed enthusiasm to engage in "ass all day everyday" with Appellant. As discussed *infra*, *Leonhardt,* 76 M.J. at 827*,* held post-assault willingness to engage in consensual sex was constitutionally required as having some tendency to indicate that recent sexual encounters were consensual. Granted, evidence of post-consensual sex was entirely excluded in *Leonhardt*, but we do not read that case as standing for the proposition that so long as the military judge allows in *some* evidence of willingness to engage in consensual sex post assault, there can be no error no matter the volume or probative and material value of the excluded evidence. LP testified Appellant had requested they engage in sexual intercourse on 3 October 2023 with LP "face down, ass up." The fact that LP, the day after the charged sexual assault, offered Appellant "ass all day everyday," why she made this offer, and what she meant by it, were relevant to whether she was sexually assaulted the previous day and merited consideration by the fact finder. We also view the exclusion of the text messages the day after the charged sexual assault as an unreasonable limitation on the Defense's ability to demonstrate the sexual encounter the previous day was consensual or that Appellant had a reasonable mistake of fact as to consent.

Therefore, contrary to the military judge's ruling, the series of text messages had a direct and substantial link to LP's credibility, a material fact at issue. *See United States v. Stavely*, 33 M.J. 92, 94 (C.M.A. 1991) (citation omitted) (noting that evidence directly probative of a witness's truthfulness is always relevant to the issue of credibility).

### d. Mil. R. Evid. 403

The military judge further ruled that any "low probative value as to the sexually tinged text messages" was "substantially (and markedly) outweighed by the high prejudicial impact under [Mil. R. Evid.] 403." He reasoned,

> [E]vidence of specific texted desires to engage in sexual activity (unrelated to the charge[d offense) is a waste of time, needlessly presents cumulative evidence, and has the potential to divert the trier of fact[']s attention from the facts related directly to the offense that allegedly occurred on or about 3 October 2023.

The military judge overstated the Mil. R. Evid. 403 concerns in this case.[13] The danger of unfair prejudice in a bench trial is low, as a military judge is "presumed to know the law and apply it correctly," is presumed capable of filtering out inadmissible evidence, and is presumed not to have relied on such evidence on the question of guilt or innocence. *See United States v. Raya*, 45 M.J. 251, 253 (1996). In the context of Mil. R. Evid. 404(b), this court and the United States Court of Appeals for the Armed Forces held, "the danger of unfair prejudice is precipitously less in a military judge alone trial when a military judge 'emphasized that he would consider the uncharged acts only for the limited purpose of establishing a common scheme or plan and not as improper propensity evidence or for any purpose prohibited by [Mil. R. Evid.] 404(b).'" *United States v. Johnson*, No. ACM 40537, 2025 CCA LEXIS 193, at *50 (A.F. Ct. Crim. App. 2 May 2025) (unpub. op.) (quoting *United States v. Greene-Watson*, 85 M.J. 340, 348 (C.A.A.F. 2025)); *see also Johnson*, unpub. op. at *50–51 (quoting *Green-Watson*, 85 M.J. at 349) ("The risk of relevant evidence causing unfair prejudice in a bench trial is nonexistent because the risk addressed in [*United States v. Staton*, 69 M.J. 228 (C.A.A.F. 2010)] [*i.e.*, that a lay trier of fact will treat evidence of uncharged acts as propensity evidence] is eliminated by the absence of a members panel." (Sparks, J., concurring in part and in the judgment) (second alteration in original)).

In the case at issue, the military judge found any probative value of LP's "texted desires to engage in sexual activity" would waste the court's time, needlessly present cumulative evidence, and would potentially divert his "attention from the facts." However, there is no dispute as to whether LP actually sent the texts and this evidence was unlikely to result in a waste of time or lead to a trial within a trial to determine whether past events actually occurred.

---

[13] At this point in the proceedings, Appellant had already elected to be tried by military judge alone.

Additionally, if a military judge is presumed capable of sifting through evidence, considering it for its proper purpose and thus virtually eliminating the prejudicial impact of inculpatory evidence, we likewise presume a military judge will not improperly use evidence when admitted as constitutionally required. In addition, the text messages in this case were crafted by LP and sent to Appellant within the confines of their marriage, not evidence involving disclosure of sexual behavior of a more potentially embarrassing source. We conclude the probative value of this evidence is high. The credibility of LP's testimony as to consent was critical to Appellant's conviction and, as discussed above, the evidence is highly probative. Further, given the absence of members, we conclude it was error to exclude this evidence under Mil. R. Evid. 403.

Because we hold the exclusion of the text messages constituted constitutional error, we must test to see if the error was harmless beyond a reasonable doubt, that is, "whether there is a reasonable possibility that the evidence [or error] complained of might have contributed to the conviction." *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) (alteration in original) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). To determine whether an error affecting an accused's right to cross-examination was harmless beyond a reasonable doubt, we apply the test developed in *Van Arsdall*, which established the following nonexclusive, five factors:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

475 U.S. at 684.

In the present case, LP's testimony was critical to the Government's case, which consisted of testimony from one eyewitness (LP) and an OSI agent. The excluded text messages were relevant and material to the matter of LP's consent. As such, LP's testimony about consent was crucial to Appellant's conviction. This factor weighs in favor of finding harm. Further, no other evidence regarding the content of the text messages was admitted, so cross-examination on them would not have been cumulative. This factor also weighs in favor of finding harm.

While LP was subjected to cross-examination, none of the questions were about her text messages to Appellant, other than the fact that she did not send him a text about being sexually assaulted. This factor also supports a finding of harm. *See Roberts*, 69 M.J. at 29 (recognizing that extensive cross-

examination of the witness alone is not enough, if the cross-examination permitted did not include questions on the issue constitutionally required).

There were incongruities inherent in LP's testimony. For example, she testified that she apologized to Appellant immediately after the charged sexual assault, and she acknowledged she sent Appellant a text message that she would discontinue her criminal allegations if he would agree to reconcile. This factor weighs in favor of finding harm.

Finally, the strength of the Prosecution's case was not overwhelming. As the central issue at trial was whether LP consented to the charged conduct, her testimony on that issue was crucial to Appellant's conviction. This factor weighs towards finding harm. There was not substantial corroborating evidence. There were no additional fact witnesses to the events of 3 October 2023; Appellant did not remember the event and denied ever sexually assaulting LP; the Government did not provide expert testimony; and LP made her allegation after Appellant left the marital home and she desired his return.

As discussed above, a reasonable fact finder might have received a significantly different impression of LP's credibility had trial defense counsel been permitted to pursue his proposed line of cross-examination. In the absence of the excluded evidence, Appellant was fettered in his ability to present evidence relevant to consent, mistake of fact, and to rebut a central Government theory of guilt that turned on the dynamics of the marriage, such that we are convinced there is a "reasonable possibility that the evidence [or error] complained of might have contributed to the conviction." *Moran*, 65 M.J. at 187 (alteration in original) (quoting *Chapman*, 386 U.S. at 324). Therefore, we find this error was not harmless beyond a reasonable doubt.

We find the military judge erred and provide relief in our decretal paragraph as to Appellant's Article 120, UCMJ, conviction. Such relief does not, however, extend to Appellant's conviction under Article 128b, UCMJ, for the reasons stated below.

**B. Domestic Violence**

**1. Law**

Article 128b, UCMJ, criminalizes violent offenses against a spouse, intimate partner, or immediate family member of that person, otherwise known as domestic violence. Article 128b(1), UCMJ, 10 U.S.C. § 928b(1).

As charged in this case, to find Appellant guilty of domestic violence, in violation of Article 128b, UCMJ, the Government was required to prove beyond a reasonable doubt: (1) that Appellant committed a violent offense, to wit: unlawfully striking LP on the face with his hand, and (2) that the violent offense was committed against LP, the spouse of Appellant. *See Manual for Courts-*

*Martial, United States* (2024 ed.) (2024 *MCM*), pt. IV, ¶ 78a.b.(1).[14] As part of this offense, the underlying violent offense was assault consummated by a battery. To find Appellant guilty of assault consummated by a battery, in violation of Article 128, UCMJ, 10 U.S.C. § 928, the Government was also required to prove beyond a reasonable doubt: (1) that Appellant did bodily harm to LP by unlawfully striking LP on the face with his hand, (2) that the bodily harm was done unlawfully, and (3) that the bodily harm was done with force or violence. *MCM*, pt. IV, ¶ 77.b.(2)(a)–(c).

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *Rodela*, 82 M.J. at 525 (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

We are neither required nor empowered to review the factual sufficiency of the evidence unless an appellant both (1) asserts an assignment of error and (2) shows a specific deficiency in the proof. *United States v. Harvey*, 85 M.J. 127, 130 (C.A.A.F. 2024). The current version of Article 66(d)(1)(B), UCMJ, states:

> (B) FACTUAL SUFFICIENCY REVIEW
>
> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a

---

[14] After the issuance of the 2019 *Manual for Courts-Martial*, but before the date of Appellant's Article 128b, UCMJ, offense (on or about 22 September 2023), the President signed an executive order which amended certain provisions of the *Manual for Courts-Martial*, to include a new paragraph 78a of the Uniform Code of Military Justice—Article 128b, UCMJ, *Domestic Violence*—outlining, *inter alia*, the elements of the offense and maximum punishments to be imposed. *See* Exec. Order No. 14,062, 3 C.F.R. 311 (31 Jan. 2022). Therefore, we refer to the 2024 *MCM* when addressing this offense.

request of the accused if the accused makes a specific showing of a deficiency of proof.

(ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

(I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

(II) appropriate deference to findings of fact entered into the record by the military judge.

(iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals (CCA)] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130 (second and third alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.* at 131.

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at 131 (internal quotation marks omitted). For this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id.* at 132. First, we must decide that evidence, as we weigh it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id.* Second, we "must be clearly convinced of the correctness of this decision." *Id.*

The elements for the Article 128b, UCMJ, conviction Appellant challenges on appeal are addressed *supra*. Self-defense is an affirmative defense to the offense and has three elements. For self-defense to apply:

First, the accused must have apprehended, on reasonable grounds, that bodily harm was about to be inflicted on him; second, the accused must have believed that the force he used was necessary for protection against bodily harm; and, third, the force used by the accused must have been "less than force reasonably likely to produce death or grievous bodily harm."

*United States v. Turner*, No. ACM 39706, 2020 CCA LEXIS 428, at *21–22 (A.F. Ct. Crim. App. 25 Nov. 2020) (unpub. op.) (quoting R.C.M. 916(e)(3)). The right to self-defense is lost "if the accused was an aggressor, engaged in mutual combat, or provoked the attack which gave rise to the apprehension, unless the accused had withdrawn in good faith after the aggression, combat, or provocation and before the offense alleged occurred." R.C.M. 916(e)(4). However, an accused who starts an affray is entitled to use reasonable force in self-defense to defend against an opponent who escalates the level of the conflict. *United States v. Dearing*, 63 M.J. 478, 484 n.24 (C.A.A.F. 2006); *Turner*, unpub. op. at *22 (citations omitted).

"Failure to retreat, when retreat is possible, does not deprive the accused of the right to self-defense if the accused was lawfully present." R.C.M. 916(e)(4), Discussion. "The availability of avenues of retreat is one factor that may be considered in addressing the reasonableness of the accused's apprehension of bodily harm and the sincerity of the accused's belief that the force used was necessary for self-protection. *Id.* Once raised, the prosecution has "the burden of proving beyond a reasonable doubt that the defense does not exist." R.C.M. 916(b)(1).

### 2. Analysis

Appellant asserts his domestic violence conviction is not factually sufficient because the Government failed to disprove he acted in self-defense when he slapped his spouse during an argument. We disagree.

#### a. Legal Sufficiency Analysis

We first determine or decision to set aside Charge II and its Specification does not affect the legal sufficiency of the domestic violence conviction. We conclude that after viewing the evidence in the light most favorable to the Government, and drawing every reasonable inference in the Government's favor, a reasonable fact finder could find Appellant guilty of all the elements of committing domestic violence under a theory of committing a violent offense, to wit: an assault consummated by a battery upon LP, an intimate partner of Appellant, beyond a reasonable doubt.

We recognize we set aside the sexual assault conviction based on the text messages' evidentiary value with respect to LP's credibility as to that Charge, and the fact that if were they introduced, it would likely have been argued LP's overall credibility was diminished. However, we see a distinction as to the domestic violence offense in that Appellant admitted to slapping LP. The question for us is whether Appellant's domestic violence conviction is sufficient, limited to the evidence produced at trial. Here, the Government introduced LP's testimony that during an argument she was two to three feet away from Appellant when he turned, aggressively approached her and slapped her twice

on each side of her face, first with the front of his hand, followed by a backhand. LP testified she heard the sound of the slap against her face and felt it for several minutes thereafter. During Appellant's OSI interview, he corroborated the fact that he slapped LP, *e.g.*, "I put my hands on her — I slapped her;" "Like, so I went over there and I slapped her, I told her [it] wasn't okay."

A factfinder may "believe one part of a witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A. 1979). Looking at these facts in the light most favorable to the Government, a factfinder could believe LP's testimony, corroborated by Appellant's statement to OSI. Accordingly, we find Appellant's conviction for domestic violence against LP legally sufficient.

### b. Factual Sufficiency Analysis

We find Appellant's argument that the Government failed to disprove the affirmative defense of self-defense constitutes a sufficiently "specific showing of a deficiency of proof" to enable this court to review the factual sufficiency of the findings. *See* 10 U.S.C. § 866(d)(1)(B)(i); *Harvey*, 85 M.J. at 130. Having weighed the evidence in the record of trial, and having made allowances that we did not personally observe the witnesses, we are not clearly convinced the finding is against the weight of the evidence.[15]

### c. Self-Defense Analysis

In conducting both our factual and legal sufficiency review, we considered the affirmative defense of self-defense. We are convinced that Appellant did not act in self-defense when he slapped LP. Appellant is approximately 6'2" in height and over 200 pounds, while LP is stands at 5'3". He took no evasive measures when LP picked up the lamp. He explained to OSI, "I'm more than capable of, of fending you off, just, you know, keeping you off of me." After LP struck Appellant with the lamp, she no longer possessed it, or any other object with which to strike Appellant, and LP was not within his immediate wingspan. He then closed the distance between them and slapped LP across the face. We find Appellant did not possess a reasonable apprehension of bodily harm when he slapped LP.

We also find the force used by Appellant was unnecessary for protection against bodily harm. According to Appellant, he is "225 pounds, like 6' 2"," and LP is "5'4", 130 pounds" and she cannot physically stop him. Appellant approached LP, not for his protection against bodily harm, but because, as he told OSI, he "I provided her multiple times, to stop putting her hands on me. Uh,

---

[15] While we have the independent authority and responsibility to weigh the credibility of the witnesses in determining factual sufficiency, we recognize that the fact finder at trial saw and heard the testimony. *See, e.g., United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006).

to, to not throw a lamp at me" and because it was "not okay" that LP had thrown objects. Appellant was not protecting himself, but admonishing LP for her behavior.

Therefore, under both the legal and factual sufficiency standard, we find that Appellant was not entitled to the defense of self-defense for the Specification of Charge I (domestic violence).

## III. CONCLUSION

The findings of guilty as to Charge II and its Specification are **SET ASIDE**. The sentence is **SET ASIDE**. A rehearing is authorized with regard to Charge II and its Specification and the sentence. The remaining findings, as entered, are correct in law and fact, and are **AFFIRMED**. Article 66(d), UCMJ, 10 U.S.C. § 866(d) (2024 *MCM*). The record of trial is returned to The Judge Advocate General. Article 66(f), UCMJ, 10 U.S.C. § 866(f). Thereafter, Article 66(b), UCMJ, 10 U.S.C. § 866(b), will apply.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court